## Lindsey's Ex'r et al. v. Lindsey

May 9, 1950.

Rehearing denied June 23, 1950.

J. Wirt Turner, Judge.

172

Thomas & Thomas for appellant.

J. Wirt Turner, Jr., for appellee.

MORRIS, COMMISSIONER—Reversing.

Appellants in interest are Virgie Sanders, Mayme Capito and Everett Lindsey, children of Lev Lindsey, deceased. Appellee is the widow of Mr. Lindsey who died May 31, 1947. His will was probated and appellant Thomas qualified as executor. The will devised to Mrs. Lindsey the home for life, but in the event she remarried to "revert to my heirs-at-law"; he also bequeathed her $2,500 in cash. He devised the remainder to his three children. In a fifth clause it was provided that the executor should not charge the wife with any money theretofore advanced unless she should renounce, in which event advancements should be taken from her share. The will was probated June 3, 1947; in December following Mrs. Lindsey renounced, and in January 1949 filed petition in which she set out the foregoing facts. For her cause she alleged that in November 1944

decedent "purchased out of the assets of his own estate" three deposit certificates, each for $5,554.63, and had one each issued to his three children. That on May 20, 1947, decedent delivered the certificates to his attorney "with instructions that they be delivered to the children after his death," and that they were so delivered. She charged that their delivery wrongfully and fraudulently deprived her of her legal interest in that portion of decedent's estate. She alleged that the personal estate of decedent amounted to $19,762.76. As shown by affidavit of the executor (the only proof as to values) the sum named above, exclusive of the certificates, seems correct; he also owned farm land valued at $25,000, and the home valued at $5,000.

She charged that Clause 5 of the *will* manifests a fraudulent intent, because decedent never made her any advancements. She alleged that "for a number of years prior to his death decedent owned and had control of the three certificates." In prayer she asked that the executor be required to set aside to her one-half the total of the certificates.

Defendants answered, first denying each allegation of the petition; secondly, specifically denying that the certificates were purchased with assets of decedent's estate. The only affirmative allegation was that the certificates were once transferred to decedent, due to the threat of plaintiff to leave him if he did not do so, and that the transfer was without their knowledge.

The cause was submitted on pleadings, exhibits and deposition; the court in an opinion concluded that the three certificates "were a part of the estate of decedent, because the attempted gift did not meet the legal requirements of a gift inter vivos or a gift causa mortis, and constituted a fraud upon the rights of the widow." It was adjudged that Mrs. Lindsey recover one-half the amount of each certificate, and the executor make no distribution until the judgment be satisfied.

The main question to be determined is whether or not the certificates were purchased from the assets of decedent's estate. As bearing on the question it may be well to look to such copies of certificates as are exhibited by plaintiff. Among the first of these is this one: "Not subject to check. United Farmer's Bank,

No. 3347. Campbellsville, Ky., May 7, 1942, $2654.14. This certifies that Mayme Capito, Virgie Sanders and E. Lindsey have deposited in this bank $2654.14, payable to themselves or order twelve months after date with interest at the rate of 1½ per cent per annum on the return of this certificate properly endorsed. No interest after maturity unless renewed, subject to thirty days written notice before payment.''

On the same day certificates of like tenor were issued to the same parties, one for $4,016.61, one for $2,953.59, one for $1,262.91, another for $2,991.46, and another for $1,799. On May 20, 1943, the bank issued to Lev Lindsey *three* certificates of the same import, each for the sum of $5,100; on November 20, 1944, the bank issued to each child a certificate stating a deposit by each of $5,100, and on May 20, 1947, these were renewed to each child in the sum of $5,554.43.

Mrs. Lindsey introduced the cashier of the bank, ostensibly for the purpose of showing that the certificates had been purchased with ''assets of decedent's estate.'' He could only testify directly as to those issued beginning in 1942. Apparently certificates had been issued to the children prior to 1942, since witness said that certificates had been issued in their names ''back to the first Twenties at least.'' He was asked, ''Who purchased these certificates?'' and answered, ''I think Mr. Lindsey did, of course, my records would probably not bear me out in this.'' As to payment of interest he said it was evidently applied to the certificates over a period of years, and some added to it. ''Mr. Lindsey, I presume, could have drawn the interest.'' He was asked ''Are you of the opinion that these certificates were purchased from the assets of Lev Lindsey's estate or from assets of the children? Ans. I have no opinion; we merely had the certificates, and had no opinion as to who purchased the original certificates;'' ''the money representing these certificates principally had been handed down ever since I became connected with the bank (1935) where it originally came from I don't know.''

Perhaps the only question and answer which would lead to an inference that any money of decedent's was used in the purchase was, ''At the time the certificates were issued to the children in 1943, who paid for them?

Ans. Lev Lindsey." On cross-examination, however, it developed that the money used to pay for these certificates was the same money collected from the certificates standing in the names of the children; he summed up by saying that as far as he knew and his records showed, the moneys collected by the children represented the principal with additions to certificates that stood in their names since 1934, except for the interval when in the name of decedent. Before taking up appellee's testimony it should be said that the three children were of Mr. Lindsey's previous marriage.

Mrs. Lindsey testified that she and Mr. Lindsey were married in 1914, and had lived together since that time, except for one month. She and her husband had separated about "25 years ago," and she had begun divorce proceedings," dismissed under the following circumstances: After separation Mr. Lindsey gave her $1,100 in cash and a cow. She called these "advancements," but says the property was given her if she would "come back and live with him." She says she did, but paid the money back to him and gave him the cow.

A marital difference arose again in October 1942; she says her husband went to Louisville on October 28, and came home drunk and went to bed. She saw an envelope in his pocket addressed to a neighbor. Inside was another envelope addressed to him, a four-page letter from another woman, and envelopes self-addressed to the writer of the letter. The contents of the letter revealed at least a more than an ordinary friendly relation between Mr. Lindsey and the writer. Appellee then obtained the husband's pocketbook and found the three certificates in the names of the children.

When the husband arose the next morning appellee confronted him with the letter and certificates, and what occurred is briefly recited by appellee: "When Lev came downstairs I handed him these time deposits and his purse; he told me if I wouldn't do anything about it he would have them made to himself when they came due; he did that and brought them home and showed them to me." She did not know that they had theretofore been in the children's names, or of the last transfer. until Mr. Thomas told her after Mr. Lindsey's death. Mr. Thomas testified that Mr. Lindsey a year be-

fore his death delivered to him the 1944 certificates and instructed him that if anything happened to him to give them to his children. He put them in his lockbox, and three weeks before Mr. Lindsey's death he asked for and took the certificates, had them renewed and brought them back, gave them to Mr. Thomas with the same instruction, which he later followed.

When we come to the evidence of the children, we find that they knew little or nothing about the certificates, and not much about their father's business. Apparently, they had all married and left home before the death of the father. Virgie Sanders testified that her father had always attended to her business. When she married and bought a home he had given or loaned her $700. The father had sold some live stock belonging to her; he had never made any settlement with or accounting to her. She and the other children testified that they had inherited some property from an aunt, Mrs. Chilton, and from their grandfather Lindsey, and introduced two wills. The Lindsey will fails to show any inheritance from the grandfather, but the aunt's will devised one-third of her property real and personal to Lev Lindsey, the remainder to the three children, and a fourth child, Mary Alice. The will named Lev Lindsey as executor. There appears in the record a settlement, and only one settlement made by him. This was dated May 28, 1931, and showed that after certain disbursements he paid to himself and Mary Alice Watrung $1050. "This left for distribution to each of the three children $985.88." In brief of appellee it is stated that the cash inheritance had been paid. This settlement does not so show, and there are no receipts filed, and each of the children say that no settlement had been made. It is not quite clear, but it may be gathered from the deposition of the husband of one of the children that Mrs. Chilton left some real estate. He says that he bought some of the land from the aunt adjoining what is called the Lev Lindsey farm, which he says Lev bought after Mrs. Chilton's death. This witness farmed the whole tract and said that Mr. Lindsey collected rents and the landlord's share, and that he never paid anything from the profits to the children.

From the foregoing it is not difficult to conclude that appellee failed, even with the assistance of the bank cashier, to prove that any of the money used in the pur-

chase of the certificates in question, was money belonging to deceased, or represented a part of the "assets of his estate."

We find appellee insisting that since the proof established that the certificates had been purchased by deceased, and in possession and control at all times, the burden shifted to the defendants to show the contrary. This would to some extent be correct if the proof had tended to establish the fact that the purchase money was a part of deceased's estate. However, we do not agree that burden ever shifted. It may be noted from our statement of the pleadings, that the defendant's answer denied generally and specifically that the purchase money came from decedent's estate. The only affirmative plea of materiality was that the 1943 transfer was under the threat of plaintiff to leave him if he did not do so, and appellee fairly substantiated this allegation. In this state of the pleadings the burden was on plaintiff and remained so throughout the trial. An issue denied by a pleading must be proven by the one alleging the fact in accordance with the established rules of pleading. Coffman v. Saat, 208 Ky. 591, 271 S. W. 668; Cumberland Bank & Trust Co. v. Buchanan et al., 291 Ky. 300, 164 S. W. 2d 473.

It is also argued that "the presumption of innocence of Lev Lindsey in transferring these certificates placed the burden on appellants to prove that he did not own them." We fail to grasp the meaning or effect of this assertion, unless it be based on the theory that deceased had purchased them with his assets. He was certainly aware of the fact that for years and years they had been issued to and carried in the name of the three children. Under the circumstances related by appellee the transfer was not in good faith, otherwise there would have been no later transfer to the children.

After a careful consideration of the whole record and briefs, we conclude that the chancellor's judgment was erroneous and it is reversed with directions to set it aside and enter a judgment holding that appellants (children) were owners of the certificates in question.

Judgment reversed.